1
2
3

PATRICK MCDONOUGH (SBN 288285)
San Diego Coastkeeper
8305 Vickers Street, Suite 209
San Diego, CA 92111
Ph: (619) 609-0860
Email: patrick@sdcoastkeeper.org

4
5
6
7
8

COAST LAW GROUP, LLP
MARCO A. GONZALEZ (SBN 190832)
LIVIA BORAK BEAUDIN (SBN 259434)
1140 South Coast Highway 101
Encinitas, CA 92024
Ph: (760) 942-8505
Fx: (760) 942-8515
email: marco@coastlawgroup.com

9
10
11

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

12
13
14
15

SAN DIEGO COASTKEEPER, a non-profit corporation; COASTAL ENVIRONMENTAL RIGHTS FOUNDATION,
a non-profit corporation,

16
17

Plaintiffs,

v.

18
19

SUPERIOR READY MIX CONCRETE, L.P., a California Limited Partnership;

20

Defendant.

Civil Case No. **'24CV0513 JLS   MMP**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*)**

21
22
23
24
25
26
27
28

Coastal Environmental Rights Foundation, ("CERF") and San Diego Coastkeeper ("Coastkeeper") (collectively "Plaintiffs"), by and through their counsel, hereby allege:

## I.   JURISDICTION AND VENUE

1.    This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201.

2.    On January 12, 2024, Plaintiffs issued a 60-day notice letter ("Notice Letter") to Superior Ready Mix Concrete, L.P. ("Defendant") as the owner and/or operator of the Facility located at 500 N. Tulip St., Escondido, CA 92025 ("Facility"), regarding its violations of the Clean Water Act and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ*), and *Order 2014-0057-DWQ as amended in 2015 and 2018* ("IGP"). True and correct copies of the Notice Letter and all enclosures are attached hereto as Exhibit 1 and incorporated herein.

3.    Plaintiffs mailed the Notice Letter to the Facility's physical address, 500 N. Tulip St., Escondido, CA 92025, and to Defendant's Agent for Service of Process via certified mail.

4.    Plaintiffs also mailed the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the California State Water Resources Control Board ("State Board"), and the Executive Officer of the San Diego Regional Water Quality Control Board ("Regional Board") as required by 40 C.F.R. § 135.2(a)(1) and 33 U.S.C. § 1365(b)(1)(A).

5.    More than sixty (60) days have passed since the Notice Letter was served on

Defendant and the State and Federal agencies. Plaintiffs are informed and believe, and thereon allege, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.    Venue is proper in the Southern District of California pursuant to 33 U.S.C. § 1365(c)(1) because the source of the violations is located within this judicial district.

## II.    **INTRODUCTION**

7.    Plaintiffs seek relief for Defendant's substantive and procedural violations of the IGP and the CWA resulting from its activities at the Facility.

8.    Specifically, Defendant has discharged and continues to discharge polluted storm water from the Facility to downstream waters and groundwater including Escondido Creek, the San Elijo Lagoon, and the Pacific Ocean (collectively "Receiving Waters") in violation of the express terms and conditions of the Clean Water Act, 33 U.S.C. §§ 1301, 1342.

9.    Defendant has also violated and continues to violate the filing, monitoring, reporting, discharge, and management practice requirements, and other procedural and substantive requirements of the IGP. These are ongoing and continuous violations of the CWA and the IGP.

10.    With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial facilities like the Facility flow into storm drain systems, local tributaries, and the Receiving Waters.

11.    Among the Receiving Waters are ecologically sensitive areas providing essential habitat for dozens of fish, hundreds of bird and numerous mammal species, as well as vital macro- and micro-invertebrate species which are an important link in the food web between the producers (leaves, algae) and higher consumers such as fish.

12.    This discharge of polluted storm water and non-storm water from the Facility causes and/or contributes to the impairment of downstream Receiving Waters

and compromises or destroys their Beneficial Uses.

13.   Storm water and non-storm water contaminated with sediment, heavy metals, nutrients, and other pollutants harm the special biological significance of the Receiving Waters. Discharges of polluted storm water and non-storm water to the Receiving Waters pose toxic, carcinogenic, and reproductive threats to the public and adversely affect the aquatic environment.

14.   The polluted discharges from the Facility also harm the special aesthetic and recreational significance that the Receiving Waters have for people in the surrounding communities, including Plaintiffs' members. The public's, including Coastkeeper's and CERF's members', use of the Receiving Waters for water contact recreation exposes people to toxic metals, carcinogenic chemicals, and other contaminants resulting from storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation and aesthetic enjoyment, are also impaired by polluted discharges, as such discharges cause or contribute to ecosystem and food web degradation.

## III.   **PARTIES**

15.   Superior Ready Mix Concrete, L.P. is an active California Limited Partnership and is the Owner and/or Operator of the Facility.

16.   Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office in San Diego, California. Coastkeeper is committed to protecting and restoring the San Diego region's water quality and supply. A member of the international Waterkeeper Alliance, San Diego Coastkeeper's main purpose is to preserve, enhance, and protect San Diego's marine sanctuaries, coastal estuaries, wetlands and bays from illegal dumping, hazardous spills, toxic discharges, and habitat degradation.

17.   Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California with its office located in Encinitas, California. CERF was founded by surfers in North San Diego County and is active throughout California's

coastal communities. CERF was established to advocate for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

18.    Many of Plaintiffs' members live and/or recreate in and around the Receiving Waters. Plaintiffs' members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife and scenery, and engage in scientific studies and restoration efforts, among other activities.

19.    Plaintiffs' members have an interest in accurate information about Defendant's discharges. Defendant's failure to accurately report and monitor impedes Plaintiffs' members' ability to fully use and enjoy the Receiving Waters for aesthetic, recreational, scientific, educational, and spiritual purposes.

20.    Defendant's failure to comply with the procedural and substantive requirements of the IGP and the CWA results in discharges of polluted storm water to the Receiving Waters. Defendant's polluted discharges degrade water quality and harm aquatic life in the Receiving Waters and thus impair Plaintiffs' members' use and enjoyment of those waters.

21.    The violations of the IGP and CWA at the Facility are ongoing and continuous. Thus, the interests of Plaintiffs' members have been and will continue to be adversely affected by Defendant's failure to comply with the IGP and the CWA.

22.    The relief sought herein will redress the harms to Plaintiffs' members caused by Defendant's activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiffs' members, for which they have no other plain, speedy, or adequate remedy at law.

23.    An actual controversy exists as to the rights and other legal relations between Defendant and Plaintiffs.

## IV.    LEGAL BACKGROUND

### A.    The Clean Water Act.

24.    The CWA requires point source discharges of pollutants to navigable waters

be regulated by an NPDES permit. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1).

25.    Section 301(a) of the Clean Water Act prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA.

26.    "Waters of the United States" are defined as "navigable waters" and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

27.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

28.    The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *See* 40 C.F.R. § 122.2; 80 F.R. § 37054.

29.    The CWA confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.

30.    The CWA requires all point source dischargers, including those discharging polluted storm water, achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 33 U.S.C. § 1311(b); 40 C.F.R. §125.3(a)(2)(ii)–(iii).

31.    Private citizens may sue under the Clean Water Act to enforce the specific provisions of California's General Permit. 33 U.S.C. § 1365(a)(1), (f)(6); *Russian River Watershed Prot. Comm. v. City of Santa Rosa,* 142 F.3d 1136, 1139 (9th Cir.1998).

**B.    California's IGP.**

32.    Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. It allows

each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

33.     California is a state authorized by the EPA to issue NPDES permits. In California, the State Board is charged with regulating pollutants to protect California's water resources. Cal. Water Code § 13001.

34.     The IGP is a statewide general NPDES permit issued by the State Board pursuant to Section 402 that regulates the discharge of pollutants from industrial sites.

35.     Between 1997 and June 30, 2015, the IGP in effect was *Order No. 97-03-DWQ* ("1997 Permit"). On July 1, 2015, pursuant to *Order No. 2014-0057-DWQ* ("2015 Permit"), the reissued 2015 IGP took effect. The 2015 Permit supersedes the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more stringent, than the terms of the 1997 Permit. On July 1, 2020, pursuant to *Order 2014-0057-DWQ as amended in 2015 and 2018* ("2020 Permit"), the reissued 2020 IGP took effect.

36.     In order to discharge storm water lawfully in California, certain industrial dischargers must secure coverage under the IGP and comply with its terms or obtain and comply with an individual NPDES permit. 2015 & 2020 Permits § I.A.12; Prior to beginning industrial operations, dischargers are required to apply for coverage under the IGP by submitting a Notice of Intent to Comply with the IGP ("NOI") to the State Board. *Id*. § I.A.17.

37.     Industrial activities covered under the IGP are described in Attachment A of the Permit. Facilities with SIC codes 20XX through 39XX require coverage by the Permit. *Id*., Attachment A.

38.     Violations of the IGP are violations of the Clean Water Act. *Id*. § XXI.A.

**C.      The IGP Discharge Prohibitions.**

39.     The IGP contains certain absolute prohibitions. "All discharges of storm water to waters of the United States are prohibited except as specifically authorized by this General Permit or another NPDES permit." *Id*. § III.A.

40.     The Discharge Prohibitions forbid the direct or indirect discharge of liquids

or materials other than storm water ("non-storm water discharges" or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *Id*. § III.B.

41. These provisions further prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. *Id*. § III.C.

42. The IGP prohibits discharges that violate any discharge prohibitions contained in local Water Quality Control Plans ("Basin Plan") or statewide water quality control plans and policies. *Id*. § III.D.

43. The San Diego Basin Plan prohibits "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives." Basin Plan at 4-20.

44. Accordingly, where the discharge does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 Permits.

**D.    The IGP Effluent Limitations.**

45. The IGP Effluent Limitation requires permittees to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of BAT and BCT. 2015 & 2020 Permits § V.A.

46. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include chemical oxygen demand ("COD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, nitrate + nitrite nitrogen ("N+N"), iron, phosphorus, enterococcus, and fecal coliform, among others.

47. Dischargers must develop and implement Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

48.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"). The 2015 MSGP went into effect on June 4, 2015, and the 2021 MSGP went into effect on March 1, 2021. The Benchmarks provide a relevant and objective standard to determine whether a facility's BMPs are effectively developed and implemented to achieve compliance with BAT/BCT standards. *See* 2015 and 2021 MSGPs, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); 86 Fed. Reg. 10,269; *see also* 2015 MSGP Fact Sheet at 52; 2021 MSGP Fact Sheet at 78.

49.    Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F. Supp. 2d 914 (C.D. Cal. 2009).

50.    Failure to develop or implement BMPs that constitute BAT and BCT is an IGP violation. 33 U.S.C. § 1311(b); 2015 & 2020 Permits § V.A.

**E.    The IGP Receiving Water Limitations.**

51.    The IGP Receiving Water Limitation prohibits storm water discharges and authorized non-storm water discharges from adversely impacting human health or the environment. 2015 & 2020 Permits § VI.B.

52.    Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the IGP's Receiving Water Limitations. *Id.*

53.    The IGP Receiving Water Limitation prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan. *Id.* § VI.A.

54.    Water quality standards ("WQSs") consist of both "designated uses" for a body of water and a set of "criteria" specifying the maximum concentration of pollutants that may be present in the water without impairing its suitability for designated uses. 33

U.S.C. § 1313(c)(2)(A).

55.     WQSs applicable to dischargers covered by the IGP include, but are not limited to, those set out in the Basin Plan, and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38. Both the CTR and Basin Plan WQSs must be attained at the point of discharge.

56.     The Basin Plan identifies designated "Beneficial Uses" for water bodies in the San Diego region under Clean Water Act Section 303. 40 C.F.R. § 131.

57.     The Beneficial Uses for Escondido Creek, downstream from the Facility, include: municipal and domestic water supply, agricultural supply, contact water recreation, non-contact water recreation, preservation of biological habitats of special significance, warm freshwater habitat, cold freshwater habitat, and wildlife habitat. Basin Plan, Table 2-2.

58.     The Beneficial Uses for the San Elijo Lagoon, downstream from the Facility, include: contact water recreation, non-contact water recreation, preservation of biological habitats of special significance, estuarine habitat, wildlife habitat, rare, threatened, or endangered species, marine habitat, migration of aquatic organisms, spawning, and reproduction, and/or early development. *Id.*, Table 2-2.

59.     Surface waters that cannot support their Beneficial Uses are designated "impaired" water bodies pursuant to Section 303(d) of the Clean Water Act.

60.     According to the 2020/2022 303(d) List, Escondido Creek is impaired for Benthic Community Effects, Bifenthrin, Cyfluthrin, Cypermethrin, DDT (Dichlorodiphenyltrichloroethane), Indicator Bacteria, Iron, Manganese, Nitrogen, Phosphate, Phosphorus, Pyrethroids, Selenium, Sulfates, Total Dissolved Solids, Toxicity, and Turbidity. California 2020-2022 Integrated Report.

61.     San Elijo Lagoon is impaired for Eutrophic, Indicator Bacteria, Dissolved Oxygen, Phosphorus, Sedimentation/Siltation, Toxicity, and Turbidity. *Id*.

62.     Polluted discharges from industrial facilities, such as the Facility, contribute to the degradation of these already-impaired surface waters, as well as aquatic-dependent

wildlife.

63.    The following WQS are established by the Basin Plan for Escondido Creek and San Elijo Lagoon: phosphorus, 0.1 mg/L; iron, 0.3 mg/L; pH "shall not be depressed below 6.5 or raised above 8.5" in inland surface waters, and "shall not be depressed below 7.0 nor raised above 9.0" in bays and estuaries. Basin Plan at 3-21; 3-45. The WQS for manganese for Escondido Creek is 0.05 mg/L. *Id*.

64.    Because the IGP Receiving Water Limitation prohibits discharges that cause or contribute to an exceedance of any applicable WQS, discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQSs, absent any authorized mixing or dilution zone, are violations of Receiving Water Limitations of the IGP. *See* 2015 & 2020 Permits § VI.A.

**F.    The IGP Storm Water Pollution Prevention Plan Requirements.**

65.    Prior to beginning industrial activities, dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). *Id*. §§ X.A–B.

66.    The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. *Id*. § X.

67.    The SWPPP must include, among other things: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored,

received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; a description of individuals and their current responsibilities for developing and implementing the SWPPP, and a Monitoring Implementation Plan. *Id.* §§ X.A−I.

68.     Dischargers must evaluate their SWPPP at least annually and revise it as necessary to ensure compliance with the IGP. 2015 Permit §§ I.J.55, X.A.9, X.B.1; 2020 Permit §§ I.K.69, X.A.9, X.B.1. The IGP require dischargers to certify and submit via the Storm Water Multiple Application & Report Tracking System ("SMARTS") database their SWPPP within 30 days whenever the SWPPP contains significant revisions. 2015 & 2020 Permits § X.B.2.

69.     The IGP requires dischargers to conduct an annual comprehensive site compliance evaluation that includes, *inter alia*, a review of all visual observation records, sampling and analysis results, and a review and evaluation of all BMPs. *Id.* § XV.

**G.      The IGP Monitoring and Reporting Requirements.**

70.     Permittees must develop and implement a monitoring implementation plan ("MIP"). *Id.* §§ X.I, XI. The MIP objectives are to ensure BMPs have been adequately developed, implemented, and revised, and confirm compliance with the IGP's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 2015 Permit §§ I.J.55−56, X.I, XI; 2020 Permit §§ X.I, X, I.K.69−70.

71.     The MIP thus aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. 2015 Permit § XX.B; 2015 Permit Fact Sheet § J at 43; 2020 Permit Fact Sheet § J at 138.

72.     Permittees must conduct monthly visual observations of storm water discharges, storm water drainage areas, and for the presence of unauthorized non-storm water discharges. 2015 & 2020 Permits § XI.A.1.

73.     A qualifying storm event ("QSE") is a precipitation event that produces a discharge for at least one drainage area and is preceded by forty-eight (48) hours with no

discharge from any drainage area. *Id.* § XI.B.1.

74.     The Reporting Year is defined as July 1 through June 30. 2015 Permit § I.M.62.b; 2020 Permit § I.N.76.b. Permittees must collect and analyze storm water samples from two (2) QSEs within the first half of each Reporting Year (July 1 to December 31), and two (2) QSEs within the second half of each Reporting Year (January 1 to June 30). *Id.* § XI.B.2.

75.     Permittees must submit all sampling and analytical results for all samples via the SMARTS database within thirty days of obtaining the results. *Id.* § XI.B.11.

76.     Permittees must analyze samples for TSS, O&G, and pH, at a minimum. *Id.* § XI.B.6.a–b.

77.     Permittees must analyze samples for other pollutants likely to be present in significant quantities in the storm water discharged from the facility that serve as indicators of the presence of all industrial pollutants. *Id.* § XI.B.6.c.

78.     Permittees must analyze storm water samples for all applicable parameters required by the Facility's SIC code, as set forth in Table 1 of the IGP. *Id.* § XI.B.6.d.

79.     Permittees must analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id.* § XI.B.6.e.

80.     Permittees must submit an annual report to the applicable Regional Board by July 15 of each year. The Annual report must include a (1) Compliance Checklist that indicates whether a discharger complies with, and has addressed all applicable requirements of the 2015 Permit, (2) an explanation for any non-compliance of requirements within the Reporting Year (3) an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the Reporting Year, and (4) the date(s) of the Annual Evaluation.

81.     All reports, certifications, or other information required by the Permit or requested by a regional board are signed by an authorized facility and certified for accuracy. *Id.* § XXI.K.

## V.      FACTUAL BACKGROUND

### A.      Facility Site Information, Industrial Activities, and Pollutant Sources.

82.     The SMARTS database indicates Defendant first obtained IGP coverage to conduct industrial operations at the Facility on May 13, 2020, under Waste Discharge Identification ("WDID") Number 9 37I028657.

83.     The Facility's Standard Industrial Classification ("SIC") code is 2951 (Asphalt Paving Mixtures and Blocks), which requires Industrial General Permit coverage.

84.     According to the Facility's SWPPP, the facility is approximately three acres in size.

85.     According to its SWPPP, the following materials may be a source of contaminants at the Facility: reclaimed asphalt pavement ("RAP"), reclaimed concrete, aggregate, asphaltic oil, asphalt additives and release agents, diesel fuel, and lubricating oil. *See generally*, SWPPP.

86.     Plaintiffs are informed, believe, and thereon allege various industrial materials are also loaded and unloaded in multiple areas of the Facility.

87.     The EPA has identified TSS, TDS, pH, COD, biological oxygen demand ("BOD"), benzene, methylene blue active substances ("MBAS"), metals, O&G, fuel additives, heavy metals, brake fluids, transmission fluids, chlorinated solvents, and arsenic as pollutants commonly associated with asphalt paving manufacturers.[1]

88.     The Facility has multiple drainage areas. Plaintiffs are informed, believe, and thereon allege that the Facility drains from multiple discharge locations.

89.     Plaintiffs are informed, believe, and thereon allege that all discharges from the Facility flow into Escondido Creek, the San Elijo Lagoon, and eventually to the Pacific Ocean.

---

[1] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector D: Asphalt Paving and Roofing Materials Manufacturers and Lubricant Manufacturers* (Feb. 2021), https://www.epa.gov/sites/default/files/2016-03/documents/sector_d_asphalt_0.pdf.

90.     Plaintiffs are informed, believe, and thereon allege that industrial activities occur, and industrial materials are handled, at various locations throughout the Facility either outdoors without adequate cover to prevent storm water and non-storm water exposure to pollutant sources, and/or without adequate secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Facility.

91.     Plaintiffs are informed, believe, and thereon allege that many pollutants associated with industrial activities occurring at the Facility regularly escape via spills, dust emissions, wind dispersion, vehicle track out, or otherwise, resulting in pollutant dispersal throughout the Facility.

92.     Plaintiffs are informed, believe, and thereon allege that pollutants associated with the Facility's industrial activities have been and continue to be tracked by vehicles and dispersed via wind throughout the entire site, and on and off the Facility through ingress and egress. This results in trucks and vehicles tracking pollutants off-site, and aerial deposition of pollutants throughout the Facility as well as offsite.

93.     Plaintiffs are informed, believe, and thereon allege that one or more regulated industrial activities are conducted at locations throughout the entire Facility, and thus the entire Facility requires IGP coverage.

94.     Plaintiffs are informed, believe, and thereon allege that even if regulated industrial activities are not conducted at all locations throughout the entire Facility, BMPs or other controls do not adequately separate the storm water flows from portions of the Facility where non-regulated activities may occur from storm water flows from the regulated industrial activities.

95.     Plaintiffs are informed, believe, and thereon allege that, due to both the Facility's lack of BMPs, and inadequacy of existing BMPs, storm water from areas of the Facility where industrial activities are conducted commingles with storm water from other areas of the Facility, and non-storm water commingles with storm water, and thus all discharges from the Facility are regulated under the IGP.

96.     Plaintiffs are informed, believe, and thereon allege that industrial activities at the Facility generate significant amounts of numerous pollutants. During rain events, these pollutants are washed off surfaces throughout the facility and into storm water discharge points, which flow to Receiving Waters.

97.     Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continue to fail to develop and/or implement required BMPs to prevent discharges of all non-storm water in violation of the IGP and the Clean Water Act.

98.     Plaintiffs are informed, believe, and thereon allege that Defendant has discharged and continue to discharge polluted storm water and non-storm water from the Facility in violation of the IGP.

99.     Plaintiffs are informed, believe, and thereon allege that the Facility's polluted discharges have caused and/or contributed, and continue to cause and/or contribute, to the impairment of water quality in Receiving Waters in violation of the IGP.

100.    Plaintiffs are informed, believe, and thereon allege that elevated levels of numerous pollutants have resulted in the inability of Receiving Waters to support their Beneficial Uses.

101.    Plaintiffs are informed, believe, and thereon allege that the illegal discharges of polluted storm water and non-storm water from the Facility impact Coastkeeper and CERF's members' use and enjoyment of the Receiving Waters by degrading the quality of those waters, and by posing risks to human health and aquatic life.

**B.      The Facility Discharges Contaminated Storm Water in Violation of the IGP.**

102.    Plaintiffs are informed, believe, and thereon allege that with every significant rain event, the Facility discharges polluted storm water via storm drainage systems into the Receiving Waters.

103.    Plaintiffs are informed, believe, and thereon allege that the Receiving Waters into which the Defendant discharges polluted storm water are waters of the

United States and therefore the IGP properly regulates discharges to those waters.

104.   Plaintiffs are informed, believe, and thereon allege that storm water and non-storm water discharges from the Facility violate the Discharge Prohibitions and Effluent Limitations of the IGP.

### 1. Discharges of Polluted Storm Water from the Facility Violate IGP Discharge Prohibitions.

105.   Plaintiffs are informed, believe, and thereon allege that the Facility has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of IGP. *See* 2015 & 2020 Permits § III.C.

106.   The California Water Code defines "contamination" as "an impairment of the quality of the waters of the state by waste to a degree which creates a hazard to the public health through poisoning or through the spread of disease."

107.   "Pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects . . . [t]he waters for beneficial uses."

108.   Storm water monitoring data obtained by Plaintiffs on December 11, 2022 demonstrates the Facility has discharged, and continues to discharge, concentrations of iron, manganese, pH, and phosphorus in excess of various water quality objectives, benchmarks, and other standards which were promulgated to protect human health and the environment, as well as the Beneficial Uses of Receiving Waters. *See* Ex. 1, December 11, 2022 Storm Water Monitoring Data. Plaintiffs are informed, believe, and thereon allege these polluted discharges cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Discharge Prohibition III.C.

109.   Plaintiffs are informed, believe, and thereon allege the Facility has discharged and continues to discharge unauthorized NSWDs in violation of IGP Discharge Prohibition III.B.

110.    Direct observations and publicly available imagery establish that wash water, fine particulates, and other sediments are tracked throughout the Facility, and out of the Facility via vehicles at the ingress/egress in violation of Discharge Prohibition III.B.

111.    Plaintiffs are informed, believe, and thereon allege Defendant has violated and continue to violate Discharge Prohibition III.D of the Permit by discharging pollutants in excess of water quality objectives listed in the San Diego Basin Plan, and other "statewide water quality control plans" such as the CTR.

112.    Waste Discharge Prohibition number 5 of the San Diego Basin Plan states, "the discharge of waste to inland surface waters, except in cases where the quality of the discharge complies with the applicable receiving water quality objectives, is prohibited."

113.    "Waste" is defined as, "waste substances, liquid, solid, gaseous, or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation," which includes discharges of pollutants in storm water. California Water Code, § 13050(d).

114.    Accordingly, where the "quality of the discharge" does not meet water quality objectives, the discharge, absent an express "allowance for dilution" by the Regional Board, is prohibited by Discharge Prohibition III.D of the 2015 and 2020 IGP.

115.    Information available to Plaintiffs, including its review of publicly available information and observations, indicates that no express allowance for dilution has been granted to the Facility's discharges or to the downstream Receiving Waters.

116.    Plaintiffs' December 11, 2022 storm water monitoring data shows high concentrations of iron, manganese, pH, and phosphorus in excess of Basin Plan Water Quality Objectives. *See* Ex. 1.

117.    Plaintiffs are informed, believe, and thereon allege the Facility has discharged and continues to discharge numerous additional pollutants in concentrations exceeding water quality objectives in violation of Discharge Prohibition III.D. For example, the EPA Fact Sheet for Sector D (Asphalt Paving and Roofing Materials

Manufacturers and Lubricant Manufacturers) specifically identifies numerous additional pollutants associated with facilities similar to the Facility, including TSS, TDS, pH, COD, BOD, MBAS, metals, O&G, fuel additives, heavy metals, brake fluids, transmission fluids, chlorinated solvents, and arsenic.[2]

118.   Information available to Plaintiffs, including their experience engaging with facilities with similar industrial activities and industrial materials, indicates that the Facility has a high potential to discharge lead, arsenic, mercury, and cadmium in its stormwater and non-stormwater discharges. It is well known that fly ash, a common filler added to asphalt concrete mixes like the Facility, is a toxic, carcinogenic compound.[3]

119.   The discharge of iron and pH-affecting substances such as acid are governed by the San Diego Basin Plan water quality objectives, and chromium, copper, lead, and nickel (heavy metals) are all controlled by the CTR.

120.   Although Defendant has never sampled for these parameters, Plaintiffs are informed, believe, and thereon allege the Facility also discharges these pollutants in excess of Basin Plan objectives and CTR criteria in violation of Discharge Prohibition III.D.

121.   Each time the Facility discharges polluted storm water or non-storm water in violation of Sections III.B–III.D of the Discharge Prohibitions provisions of the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

122.   These Discharge Prohibition violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that prevent such discharges.

123.   Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Discharge Prohibitions since at least May 13, 2020 and is subject to

---

[2] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector D.*

[3] https://onlinepubs.trb.org/Onlinepubs/trr/1991/1323/1323-013.pdf

civil penalties for all violations of the Clean Water Act occurring since that time. *See* Exhibit 1, internal Exhibit 2, (setting forth dates of all precipitation events during the past five years).

### 2. Discharges of Polluted Storm Water from the Facility Violate IGP Effluent Limitations.

124.   Plaintiffs are informed, believe, and thereon allege that Defendant has failed and continue to fail to develop and/or implement BMPs as required to achieve compliance with the BAT/BCT standards to prevent the discharge of polluted storm water from the Facility. *See* 2015 & 2020 Permits § V.A.

125.   Visual observations of the Facility confirm that it lacks adequate BMPs. *See generally*, Ex. 1.

126.   Plaintiffs are informed, believe, and thereon allege that BMPs that would achieve BAT/BCT have not been developed and/or implemented at the Facility. Plaintiffs directly observed and photographed evidence of poor housekeeping, such as, exposed material stockpiles, track out of fine particulates, and debris and trash along the Facility's perimeter on December 11, 2022. The same poor housekeeping can be seen in photographs taken by the City of Escondido during a routine inspection on June 23, 2023.

127.   Additionally, as reflected in the December 11, 2022 storm water monitoring data, the Facility's discharge showed high concentrations of iron, pH, phosphorus, and manganese, indicating the Facility's BMPs are insufficient, and thus fail to achieve BAT/BCT.

128.   Each time Defendant discharges polluted storm water in violation of Effluent Limitation V.A of the 2015 and 2020 Permits is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

129.   These effluent limitation violations are ongoing and will continue every time the Facility discharges polluted storm water and non-storm water without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards.

130.    Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation of these Effluent Limitations since at least May 13, 2020 and is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**C.    Discharges of Polluted Storm Water from the Facility Violate IGP Receiving Water Limitation.**

131.    Plaintiffs are informed, believe, and thereon allege that the Facility has violated and continues to violate IGP Receiving Water Limitations.

132.    According to the 2020/2022 303(d) List, Escondido Creek is impaired for phosphorus and phosphate, and San Elijo Lagoon is impaired for eutrophic conditions and dissolved oxygen.

133.    Plaintiffs' December 2022 sample of the Facility's storm water discharge exceeded the Basin Plan Water Quality Objective for phosphorus of 0.1 mg/L.

134.    Excess concentrations of nutrients such as phosphorus can reduce levels of dissolved oxygen and cause hypoxia or harmful algal blooms that can create toxins, a process known as eutrophication. Such toxins can move up the food chain.[4] High phosphorus loadings also result in reduced spawning grounds and nursery habitats, fish kills, and public health concerns related to impaired drinking water sources and increased exposure to toxic microbes.[5]

135.    Therefore, the Facility's discharges of high levels of phosphorus cause and/or contribute to Escondido Creek's phosphorus and phosphate impairments, and San Elijo Lagoon's eutrophic conditions and dissolved oxygen impairments.

136.    Escondido Creek is also impaired for iron.

---

[4] U.S. EPA, *Nutrient Pollution, The Effects: Environment*, https://www.epa.gov/nutrientpollution/effects-environment *(last updated Apr. 15, 2019)*.

[5] U.S. EPA, *Memorandum, Nutrient Pollution and Numeric Water Quality Standards* (May 5, 2007) https://www.epa.gov/sites/production/files/2014-08/documents/nutrient-memo-may252007.pdf.

137.   The Facility's discharges exceed the Basin Plan iron Water Quality Objective of .3 mg/L by 15 times the limit, with a result of 4.6 mg/L.

138.   Therefore, the Facility's polluted discharges cause and/or contribute to Escondido Creek's iron impairment.

139.   Plaintiffs are informed, believe, and thereon allege the Facility routinely discharges various sediments, particulates, aggregates, dirt, mud, and other various other solids in excess of applicable WQSs. For example, the Facility's trackout, and buildup of sediments around the Facility's drainage pathways indicate the Facility regularly discharges TSS and TDS in excess of applicable Basin Plan Water Quality Objectives.

140.   The San Diego Basin Plan mandates that "[w]aters shall not contain suspended and settleable solids in concentrations of solids that cause nuisance or adversely affect beneficial uses." Basin Plan at 3-32.

141.   "Suspended and settleable solids are deleterious to benthic organisms and may cause the formation of anaerobic conditions. They can clog fish gills and interfere with respiration in aquatic fauna. They also screen out light, hindering photosynthesis and normal aquatic plant growth and development." *Id*. at 3-31.

142.   Plaintiffs are informed, believe, and thereon allege the Facility's polluted discharges cause and/or contribute to the Escondido Creek's turbidity and benthic community effects impairments, and San Elijo Lagoon's sedimentation/Siltation and turbidity impairments.

143.   Defendant has failed and continues to fail to analyze storm water discharged from the Facility in violation of the Permit. As such, in addition to various settleable and dissolved solids, some of which can be visually observed, the Facility likely discharges many other pollutants in concentrations exceeding applicable Basin Plan water quality objectives and CTR criteria.

144.   The Basin Plan is an applicable WQSs under the IGP.

145.   Therefore, the Facility's storm water discharges containing concentrations of pollutants in excess of applicable WQSs, which cause and/or contribute to respective

impairments of Receiving Waters, violate the Receiving Water Limitations of the IGP. 2015 & 2020 Permits § VI.A.

146.    Discharges of elevated concentrations of pollutants in the Facility's storm water also adversely impact human health. These harmful discharges from the Facility are also violations of the IGP Receiving Water Limitations. *See* 2015 & 2020 Permits § VI.B.

147.    Each time Defendant discharges polluted storm water in violation of the IGP's Receiving Water Limitations is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

148.    Plaintiffs are informed, believe, and thereon allege that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the IGP's Receiving Water Limitations.

149.    Plaintiffs are informed, believe, and thereon allege that the Facility has been in violation since May 13, 2020 and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since that time.

**D.    Defendant Has Violated and Continue to Violate IGP SWPPP Requirements.**

150.    Plaintiffs are informed, believe, and thereon allege that Defendant has conducted and continue to conduct operations at the Facility with an inadequately developed and/or implemented SWPPP.

151.    Defendant submitted a SWPPP to SMARTS on May 13, 2020 and has never uploaded an amended or updated SWPPP to SMARTS since that time.

152.    Plaintiffs are informed, believe, and thereon allege that the Facility has not updated its SWPPP since May 13, 2020.

153.    Plaintiffs are informed, believe, and thereon allege that the Facility is currently operating without a valid SWPPP.

154.    Plaintiffs are informed, believe, and thereon allege the Facility SWPPP fails to contain BMPs that would prevent the exposure of pollutants to storm water, the

comingling of non-storm water with storm water, and the subsequent discharge of pollutants from the Facility, in violation of the IGP.

155.    Plaintiffs are informed, believe, and thereon allege the Facility SWPPP and site map fail to accurately reflect on-the-ground site conditions.

156.    The SWPPP and site map identify DP-2 as a parking area, purportedly exempting it from the Permit's sampling requirements. However, photographic and video evidence reveal the Facility stores industrial material and conducts industrial activity within DP-2.

157.    The SWPPP also fails to identify BMPs for erodible surfaces. The SWPPP states that the soil is compacted by heavy machinery, limiting the potential erosion. Compaction by heavy machinery is not a BMP for soil erosion. Additionally, even if it were a BMP, heavy machinery does not roam every corner and recess of the site. The SWPPP lists the only potential BMP for soil erosion as paving, but the Facility has not paved these areas and thus not implemented that BMP.

158.    Plaintiffs are informed, believe, and thereon allege the SWPPP does not include an adequate pollutant source assessment.

159.    The SWPPP fails to adequately describe all industrial activities and materials, potential pollutant sources, and areas of industrial activity, the SWPPP consequently fails to acknowledge the nutrients, metals, pH affecting substances, and other pollutants in the Facility's discharge.

160.    The SWPPP fails to account for numerous pollutants recognized by the EPA as associated with asphalt manufacture.[6] Further, the SWPPP does not acknowledge fly ash as a potential pollutant, despite its effects on water quality. The storm water sample collected by CERF supports these metals as potentially present pollutants – the samples indicate that the Facility releases iron, manganese, and phosphorus in excess of water quality objectives.

---

[6] U.S. EPA, *Industrial Stormwater Fact Sheet Series, Sector D, see* note 11, *supra.*

161.   According to the Facility SWPPP, none of the pollutants for which Escondido Creek is impaired are found at the Facility. Nonetheless, high concentrations of phosphorus and manganese were found in the Facility's discharge, for which Escondido Creek is impaired.

162.   Plaintiffs are informed, believe, and thereon allege the Facility's SWPPP and site map also fail to accurately identify all discharge points.

163.   Direct observations demonstrate the Facility discharges from an opening in the perimeter fence on the West side of the property and into the private side street that runs along the property boundary (see Exhibit 1, Picture 8). The SWPPP and site map fail to account for this discharge point, which is an ongoing and continuous violation of the Section X.E.3 of the IGP.

164.   Plaintiffs are informed, believe, and thereon allege the Facility does not comply with the Permit's minimum BMP requirements.

165.   The December 2022 storm water monitoring data shows high levels of pollutants in exceedance of applicable WQSs and benchmarks, indicating the Facility's BMPs continue to fail to adequately (1) minimize pollutant exposure to storm water at the Facility; (2) control and minimize polluted runoff from the Facility; (3) treat and remove pollutants in storm water prior to discharge; (4) prevent or control contaminated storm water from being discharged from the Facility; or (5) prevent or control contaminated NSWDs from being discharged from the Facility, all of which violate the Industrial General Permit.

166.   On December 11, 2022, the Facility lacked any BMPs to cover or surround the material stockpiles at the Facility; various sand, sediments, and fine particulates were tracked around the Facility, as well as on and out of the Facility's driveways; and trash and debris were observed along the Facility's perimeter. The same poor housekeeping was documented by the City of Escondido during a routine inspection on June 23, 2023.

167.   Plaintiffs are informed, believe, and thereon allege identified BMPs are not being adequately implemented. For example, the Facility fails to implement adequate

BMPs to prevent fugitive sediment and/or particulate dispersion via wind and trucks, which accumulate along the Facility wall and flow path of the drainage basin, and intersects with the sample point.

168.   Defendant has operated the Facility since at least May 13, 2020 without a valid SWPPP. Every day the Facility operates with an inadequately developed and/or implemented SWPPP, and/or with an improperly revised SWPPP is a separate and distinct violation of the IGP and the Clean Water Act.

169.   Defendant has been in daily and continuous violation of the IGP's SWPPP requirements since at least May 13, 2020.

170.   These violations are ongoing and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since May 13, 2020.

**E.   Defendant Has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan at the Facility.**

171.   Plaintiffs are informed, believe, and thereon allege Defendant has conducted and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or revised MIP.

172.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to collect the required number of storm water samples for each reporting period.

173.   While Defendant is part of a Compliance Group, and thus is required to collect only two samples each reporting period, Defendant has failed to collect a single storm water sample since May 13, 2020.

174.   Numerous QSEs occurred during each reporting period, including the series of atmospheric rivers that broke precipitation records in some parts of the region in early 2023. *See* Ex. 1, internal Exhibit 2, Precipitation Data.

175.   Although the SWPPP site map shows that the Facility has a retention basin that can retain some storm water, the Facility's documentation lacks any information regarding the capacity of the pond to establish that it would not discharge. Direct

observations of the wash pond strongly indicate the Facility lacks the retention capacity to retain the volume from runoff produced from an 85th percentile 24-hour storm event for the entire Facility.

176.   Further, even if the Facility could meet design storm standards, and complied with Alternative Compliance requirements of Attachment I of the Industrial General Permit, which it does not, the Permit still requires the Facility to collect and analyze samples of its storm water discharges, which it has failed to do.

177.   Thus, Plaintiffs are informed, believe, and thereon allege the Facility regularly discharges storm water and commingled non-storm water, and the Defendant failed and continues to fail to collect the required number of storm water samples in violation of the IGP.

178.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to develop and/or implement a MIP that requires the collection of storm water samples "from each drainage area at all discharge locations" at the Facility in violation of Industrial General Permit. *See* 2015 & 2020 Permits § XI.B.4.

179.   While Section XI.C.4 of the Permit allow permittees to reduce the number of locations to be sampled, there is no indication Defendant has complied with the requirements of Section XI.C.4 to justify sampling a reduced number of discharge locations at the Facility.

180.   Because industrial activities take place within DA2, the Facility's failure to include this discharge point within the MIP results in an inadequate MIP. Similarly, the Facility's failure to identify the discharge point at the northwest end – which discharges to the alley – constitutes a Permit violation.

181.   Plaintiffs are informed, believe, and thereon allege the Defendant has failed and continues to fail to sample and analyze storm water discharges for all parameters required by the Industrial General Permit.

182.   The Facility has failed to sample additional parameters that would indicate the presence of all industrial pollutants, pursuant to Section XI.B.6.c of the IGP. As

explained *supra*, information available to Coastkeeper and CERF indicates pollutants associated with the Facility's industrial activities and materials include many pollutants for which the Facility does not analyze its samples, such as lead, arsenic, mercury, cadmium, COD, BOD, benzene, MBAS, metals, O&G, fuel additives, brake fluids, transmission fluids, chlorinated solvents, and arsenic. The Facility Owners and/or Operators have failed to analyze samples for any of these parameters.

183.    CERF's December 11, 2022 monitoring of the Facility indicates the Facility's industrial activities and materials contribute significant amounts of manganese, iron, and phosphorus. Had the Facility collected its own sample, pursuant to its inadequate MIP, it would nonetheless have failed to analyze its storm water discharges for these parameters. This is particularly problematic as downstream Receiving Waters are impaired for some of these same pollutants (manganese and phosphorus).

184.    Plaintiffs are informed, believe, and thereon allege the Defendant has failed and continues to fail to sample for pollutants that may contribute to Receiving Water impairments as required by Section XI.B.6.e of the IGP.

185.    Plaintiffs are informed, believe, and thereon allege the Defendant has failed and continues to fail to sample for pollutants that may contribute to Receiving Water impairments, such as nutrients, metals affecting toxicity (such as selenium, lead, chromium, copper, nickel, and manganese), and TDS. *See* 2015 & 2020 Permit § XI.B.6.e.

186.    The December 11, 2022 monitoring data collected by Plaintiffs serves as the only recent sampling ever conducted for the Facility, and indicates the Facility's industrial activities and materials contribute significant amounts of manganese, iron, and phosphorus to Receiving Waters.

187.    Plaintiffs are therefore informed, believe, and thereon allege Defendant has failed and continues to fail to conduct visual observations of storm water discharges, of authorized and unauthorized NSWDs, and of BMPs required by the IGP.

188.    Plaintiffs direct observations, the Facility's lack of BMPs and poor

housekeeping, the SWPPP and site map's failure to align with on-the-ground conditions, and the Facility's repeated failure to collect the required number of storm water samples despite numerous QSEs, evidence Defendant's failure to consistently, and/or adequately, conduct the required discharge observations and monitoring of BMPs.

189.   Every day the Facility operates with an inadequately developed and/or implemented MIP, or with an improperly revised MIP is a separate and distinct violation of the IGP and the Clean Water Act.

190.   Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's MIP requirements since at least May 13, 2020.

191.   Plaintiffs are informed, believe, and thereon allege these violations are ongoing, and Defendant is subject to civil penalties for all violations of the IGP and Clean Water Act occurring since at least May 13, 2020.

**F.      Defendant Has Violated the IGP's Reporting Requirements.**

192.   Plaintiffs are informed, believe, and thereon allege Defendant has failed and continues to fail to submit Annual Reports that comply with the IGP reporting requirements.

193.   For example, 2020-2021, 2021–2022, and 2022-2023 Annual Reports claim that Facility failed to collect any storm water samples during that reporting period because "[t]here were no discharges during a qualifying storm event." However, precipitation data indicates that numerous QSE's and sequential storm events occurred in the past three years, which likely caused many discharges during Facility operating hours.

194.   The Facility's annual reports are certified attesting to the Facility's compliance with the terms of the IGP.

195.   As such, the Annual Report certifications are erroneous, and the Facility's Environmental Coordinator, Shawn Mendoza, who certified these Annual Reports, knew or should have known that the assertion that the Facility had not discharged storm water during operating hours at any point for the past three years was a false statement.

196.   In each Annual Report, the Facility Owner and/or Operator certifies that: (1) a complete Annual Comprehensive Site Compliance Evaluation was conducted as required by the IGP; (2) the SWPPP's BMPs address existing potential pollutant sources; and (3) the SWPPP complies with the IGP, or will otherwise be revised to achieve compliance. "Clean Water Act section 309(c)(4) provides that any person that knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both." 2015 & 2020 Permits § XXI.N.

197.   Every day Defendant conducts operations at the Facility without reporting as required by the IGP is a separate and distinct violation of the IGP and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

198.   Plaintiffs are informed, believe, and thereon allege Defendant has been in daily and continuous violation of the IGP's reporting requirements every day since at least May 13, 2020.

199.   Plaintiffs are informed, believe, and thereon allege these violations are ongoing, and Defendant is subject to civil penalties for all violations of the Clean Water Act occurring since May 13, 2020.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the IGP's Discharge Prohibitions and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

200.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

201.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge unauthorized non-storm water in violation of

Section III.B of the IGP.

202.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in concentrations that cause or threaten to cause pollution, contamination, or nuisance in and around Receiving Waters in violation of Section III.C of the IGP.

203.   Plaintiffs are informed and believe, and thereon allege that Defendant has discharged and continues to discharge numerous pollutants in excess of water quality objectives listed in the Basin Plan in violation of Section III.D of the IGP.

204.   Plaintiffs are informed and believe, and thereon allege that Defendant has been in violation of the IGP Discharge Prohibitions at the Facility every day from at least May 13, 2020 to the present. Plaintiffs are informed and believe, and thereon allege that Defendant's violations of the IGP Discharge Prohibitions are ongoing and continuous.

205.   Each and every violation of the IGP Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from May 13, 2020 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SECOND CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the IGP's Effluent Limitations and the Clean Water Act.

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

206.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

207.   Plaintiffs are informed, believe, and thereon allege Defendant failed and continues to fail to reduce or prevent pollutants associated with industrial activities from discharging through implementation of BMPs that achieve BAT/BCT at the Facility.

208.   Plaintiffs are informed and believe, and thereon allege, that discharges of

storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards occur every time storm water discharges from the Facility.

209. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the IGP and the CWA. *See* 2015 & 2020 Permits § V.A; *see also* 33 U.S.C. § 1311(b).

210. Defendant violated and continues to violate the IGP Effluent Limitations each time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharge from the Facility.

211. Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Effluent Limitations at the Facility every day from at least May 13, 2020 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Effluent Limitations and the CWA are ongoing and continuous. Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop and/or implement BMPs to achieve BAT/BCT at the Facility.

212. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

213. Each day that Defendant operates the Facility without adequately developing and/or implementing BMPs that comply with Effluent Limitations in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 13, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

/././

/././

/././

/././

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of IGP Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

214.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

215.   Plaintiffs are informed and believe, and thereon allege, that the Facility discharges storm water containing levels of pollutants that adversely impact human health and/or the environment.

216.   Plaintiffs are informed and believe, and thereon allege, that Defendant discharges storm water containing levels of pollutants that cause or contribute to exceedances of WQSs from the Facility.

217.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

218.   Plaintiffs are informed and believe, and thereon allege, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of WQSs occur each time storm water discharges from the Facility.

219.   Defendant's discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment, and/or that cause or contribute to exceedances of WQSs, are violations of the IGP and the Clean Water Act. 2015 & 2020 Permits §§ VI.A–B; 33 U.S.C. § 1311(b).

220.   Plaintiffs are informed, believe, and thereon allege Defendant violated and will continue to violate the IGP Receiving Water Limitations every time storm water containing levels of pollutants that adversely impact human health or the environment, or that cause or contribute to exceedances of WQSs discharge from the Facility.

221.   Plaintiffs are informed and believe, and thereon allege, that Defendant has been in violation of the IGP Receiving Water Limitations at the Facility every day from

May 13, 2020 to the present. Plaintiffs are informed, believe, and thereon allege Defendant's violations of the IGP Receiving Water Limitations and the CWA are ongoing and continuous.

222.   Defendant will continue to be in violation of the IGP and the CWA each time storm water containing levels of pollutants that adversely impact human health or the environment, or that causes or contributes to exceedances of WQSs is discharged from the Facility.

223.   Each day that Defendant has discharged and/or continues to discharge polluted storm water from the Facility in violation of the IGP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

224.   Plaintiffs are informed, believe, and thereon allege Defendant has been in violation of the IGP Receiving Water Limitations every day since May 13, 2020. By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA since May 13, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

### FOURTH CAUSE OF ACTION
**Failure to Adequately Develop, Implement, and/or Revise the Facility's Storm Water Pollution Prevention Plans in Violation of the IGP and the Clean Water Act.**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

225.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

226.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement adequate SWPPPs for the Facility.

227.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to adequately revise the SWPPP for the Facility.

228.   Defendant conducts operations at the Facility each day without an adequately developed, implemented, and/or revised SWPPP. Defendant's failure to

adequately develop, implement, and/or revise SWPPPs for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § X; *see also* 33 U.S.C. § 1311(b).

229.   Defendant has been in violation of the IGP SWPPP requirements at the Facility every day from at least May 13, 2020, to the present. Defendant's violations of the IGP SWPPP requirements and the CWA at the Facility are ongoing and continuous.

230.   Defendant will continue to be in violation of the IGP and the CWA each day it fails to adequately develop, implement, and revise the Facility SWPPP.

231.   Each day Defendant operates the Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of Section 301(a) of the CWA 33 U.S.C. §1311(a). By committing the acts and omissions alleged above, Defendant is subject to civil penalties for each and every violation of the CWA occurring since May 13, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and Revise Adequate Monitoring Implementation Plan in Violation of the IGP and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

232.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

233.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to develop and/or implement an adequate MIP for the Facility. Defendant operates the Facility each day without an adequately developed, implemented, and/or revised MIP.

234.   Defendant's failure to adequately develop, implement, and/or revise the MIP for the Facility is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XI; *see also* 33 U.S.C. § 1311(b).

235.   Defendant has been in violation of the IGP MIP requirements every day from at least May 13, 2020, to the present. Defendant's violations of the IGP MIP

requirements and the CWA at the Facility are ongoing and continuous.

236.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to adequately develop, implement, and/or revise the Facility MIP.

237.   Each day that Defendant operates the Facility without developing, implementing, and/or revising an adequate MIP is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 13, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SIXTH CAUSE OF ACTION

### Failure to Properly Monitor in Violation of the IGP.
### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)

238.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

239.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to conduct the requisite visual observations of storm water discharges at the Facility in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.A; *see also* 33 U.S.C. § 1311(b).

240.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect and analyze the required number of storm water samples at the Facility in violation of the IGP and the CWA. 2015 Permit & 2020 Permits §§ XI.B.1–3; 33 U.S.C. § 1311(b).

241.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to analyze all collected samples for all required parameters in violation of the IGP and the CWA. *See* 2015 & 2020 Permits § XI.B.6; *see also* 33 U.S.C. § 1311(b).

242.   Plaintiffs are informed and believe, and thereon allege that Defendant has failed and continues to fail to collect storm water samples "from each drainage area at all

discharge locations" at the Facility in violation of IGP and CWA. *See* 2015 & 2020 Permits § XI.B.4; *see also* 33 U.S.C. § 1311(b).

243.   Plaintiffs are informed and believe, and thereon allege, that Defendant has failed and continues to fail to comply with the IGP's monitoring requirements at the Facility since at least May 13, 2020. Defendant's violations of the IGP monitoring requirements and the Clean Water Act are ongoing and continuous.

244.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP's monitoring requirements.

245.   Each and every violation of the IGP's monitoring requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 13, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## SEVENTH CAUSE OF ACTION

**Failure to Report as Required in Violation of the IGP and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**

246.   Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

247.   Defendant has failed and continues to fail to submit accurate and/or complete Annual Reports for the Facility.

248.   Defendant's failure to submit complete and accurate Annual Reports is a violation of the IGP and the Clean Water Act. *See* 2015 & 2020 Permits § XVI; *see also* 33 U.S.C. § 1311(b).

249.   Defendant conducts operations at the Facility each day without reporting as required by the IGP. Defendant has been in violation of the IGP's reporting requirements every day since at least May 13, 2020. Defendant's violations of the reporting requirements of the IGP and the CWA are ongoing and continuous.

250.   Defendant will continue to be in violation of the IGP and the CWA each and every day it fails to comply with the IGP reporting requirements at the Facility.

251.   Each and every violation of the IGP reporting requirements is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a). By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring since May 13, 2020. 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

## VII.   RELIEF REQUESTED

252.   Plaintiffs respectfully request that this Court grant the following relief:

a.   A court order declaring the Defendant has violated and continues to be in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to comply with discharge prohibitions, effluent limitations which include BAT/BCT requirements, and for failing to comply with the other substantive and procedural requirements of the IGP as set forth within this Complaint;

b.   A court order enjoining Defendant from discharging pollutants from the Facility to surface waters in violation of the Clean Water Act and IGP;

c.   A court order requiring Defendant to implement affirmative injunctive measures designed to eliminate Defendant's violations of the substantive and procedural requirements of the IGP and the Clean Water Act;

d.   A court order assessing civil monetary penalties for each violation of the CWA at $66,712 per day per violation for violations that occurred after November 2, 2015 and assessed on or after January 6, 2023, as permitted by CWA Section 309(d), 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, and 40 C.F.R. § 19.4.

e.   A court order awarding Plaintiffs their reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean

Water Act, 33 U.S.C. § 1365(d); and

       f.     Any other relief as this Court may deem appropriate.

Dated: March 18, 2024

                                        Respectfully submitted,

                                        COAST LAW GROUP LLP
By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorney for Plaintiffs
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com


                                        SAN DIEGO COASTKEEPER
By: s/Patrick McDonough
PATRICK MCDONOUGH
Attorney for Plaintiffs
SAN DIEGO COASTKEEPER
E-mail: patrick@sdcoastkeeper.org